**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

TEAMSTERS LOCAL 710 PENSION FUND, on Behalf of Itself and All Others Similarly Situated,

Plaintiff,

v.

YORK SPACE SYSTEMS INC.,
DIRK WALLINGER,
KEVIN MESSERLE,
BRIAN FRANTZ,
KIRK KONERT,
TYLER LETARTE,
TAMRA ERWIN,
REGINALD BROTHERS,
ANDREW BOYD,
JAMES MCCONVILLE,
AE INDUSTRIAL PARTNERS, LP,
GOLDMAN SACHS & CO. LLC,
JEFFERIES LLC,
WELLS FARGO SECURITIES, LLC,
J.P. MORGAN SECURITIES LLC,
CITIGROUP GLOBAL MARKETS INC.,
TRUIST SECURITIES, INC.,
ROBERT W. BAIRD & CO. INCORPORATED,
RAYMOND JAMES & ASSOCIATES, INC.,
CANACCORD GENUITY LLC,
NEEDHAM & COMPANY, LLC and
ACADEMY SECURITIES, INC.,

Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**<u>DEMAND FOR JURY TRIAL</u>**

---

Plaintiff Teamsters Local 710 Pension Fund ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by York Space Systems Inc. ("YSS" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed reports and information about the Company.[1] Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of: (i) all purchasers of YSS common stock in or traceable to the Company's January 2026 initial public offering (the "IPO"); and (ii) all purchasers of YSS common stock between January 29, 2026 and August 13, 2026, inclusive (the "Class Period").

2. YSS is a major aerospace and defense contractor. Substantially all of its revenue comes from U.S. government contracts for satellite systems that detect missiles and other threats

[1] Prior to January 28, 2026, YSS operated as a Delaware limited liability company under the name Yellowstone Midco Holdings II, LLC ("Midco II"), which directly and indirectly held all of the equity interests in the Company's operating subsidiaries. Substantially concurrent with the effectiveness of the registration statement at issue herein, Midco II converted into a Delaware corporation pursuant to a statutory conversion and changed its name to York Space Systems Inc. (the "Corporate Conversion"). References to the Company prior to the Corporate Conversion are references to Midco II. References to the Company after the Corporate Conversion are to YSS.

from space and relay the relevant data to military assets around the globe. Unbeknownst to investors, prior to its IPO YSS had encountered numerous delays, failures, and technical difficulties in performing its obligations under these contracts, such that the Pentagon ultimately decided against further funding of YSS's portion of the program. The Pentagon's decision was actualized mere days after the Company's IPO when the Consolidated Appropriations Act, 2026 was signed into law on February 3, 2026, and the legislation only appropriated a token amount to the Department of Defense ("DoD") for potential funding.

3. Notwithstanding the manifest importance of these issues to the Company's business, YSS failed to disclose the relevant facts, attendant risks, and likely impact of these adverse developments in the registration statement for the IPO (the "Registration Statement"). During the Class Period, defendants continued to misrepresent YSS's technical prowess and performance and misled investors about the Company's financial prospects, most notably by inflating the Company's 2026 revenue guidance without a reasonable basis in objective fact.

4. Since the IPO, the price of YSS stock has fallen from highs of more than $38 per share to lows below $6 per share – over 80% below the $34 IPO price.

5. To recover the damages suffered by investors as a result of defendants' conduct detailed herein, Plaintiff is pursuing strict liability claims under the Securities Act of 1933 (the "1933 Act") for purchases of YSS stock in or traceable to the IPO and claims for fraud under the Securities Exchange Act of 1934 (the "1934 Act") for purchases of YSS stock made during the Class Period.

## JURISDICTION AND VENUE

6. The claims alleged herein arise under §§11 and 15 of the 1933 Act (15 U.S.C. §§77k and 77o) and §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v), and §27 of the 1934 Act (15 U.S.C. §78aa).

8. This Court has personal jurisdiction over each of the defendants and venue is proper in this District. YSS is headquartered in this District, and defendants conducted the IPO in substantial part from this District, drafted the Registration Statement in substantial part in this District, disseminated the statements alleged to be false and misleading herein from this District, and solicited purchasers of YSS common stock in and from this District.

9. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10. Plaintiff Teamsters Local 710 Pension Fund purchased YSS common stock during the Class Period and traceable to the IPO, as detailed in the certification attached hereto and incorporated by reference herein, and has been damaged thereby.

11. Defendant YSS is a spacecraft solutions provider which sells satellites and related systems and services primarily to the DoD. The Company is headquartered in Greenwood Village,

Colorado and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "YSS."

12. Defendant Dirk Wallinger ("Wallinger") served as the Company's Chief Executive Officer ("CEO") during the Class Period and signed the Registration Statement. Defendant Wallinger also consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO.

13. Defendant Kevin Messerle ("Messerle") served as the Company's Chief Financial Officer ("CFO") during the Class Period and signed the Registration Statement.

14. Defendant Brian Frantz served as the Company's Chief Accounting Officer ("CAO") during the Class Period and signed the Registration Statement.

15. Defendant Kirk Konert ("Konert") served as Midco II's manager and signed the Registration Statement. Defendant Konert also consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO. Since December 2023, Konert has been a managing partner at AE Industrial Partners, LP ("AE Industrial").

16. Defendant Tyler Letarte ("Letarte") served as Midco II's manager and signed the Registration Statement. Defendant Letarte also consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO. Since December 2023, Letarte has been a principal at AE Industrial.

17. Defendant Tamra Erwin consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO.

18. Defendant Reggie Brothers ("Brothers") consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO. Since October 2022, defendant Brothers has been an operating partner of AE Industrial.

19. Director Andrew Boyd ("Boyd") consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO. Since March 2025, defendant Boyd has been an operating partner at AE Industrial.

20. Director James McConville ("McConville") consented to be named as a director nominee in the Registration Statement and became a director of the Company upon completion of the IPO. Since September 2023, defendant McConville has been an operating partner at AE Industrial.

21. The defendants identified in ¶¶12-20 are referred to herein as the "Individual IPO Defendants." Each of the Individual IPO Defendants signed the Registration Statement and/or consented to be named as directors or director nominees of the Company in the Registration Statement as detailed above. In addition, the Individual IPO Defendants participated in the solicitation and sale of YSS common stock to investors in the IPO for their own benefit and the benefit of YSS and AE Industrial as directors, executive officers, and/or major shareholders of the Company and/or the principals of AE Industrial.

22. Defendant AE Industrial Partners, LP is a U.S.-based private equity firm. AE Industrial (through affiliated entities) owned the Company prior to the IPO. Upon the consummation of the IPO, AE Industrial (through affiliated entities) owned much of YSS's outstanding shares and was party to voting arrangements granting it control of more than 50% of the total voting power of the Company's common stock with respect to the election of directors.

The Registration Statement acknowledged that, following the IPO, YSS would be a "controlled company" within the meaning of the corporate governance rules of the NYSE, thereby exempting the Company from certain NYSE corporate governance requirements including the requirement that a majority of the Company's Board of Directors consist of independent directors. The Registration Statement further acknowledged that AE Industrial controlled YSS, including control over the election of YSS's directors, the adoption of amendments to the Company's certificate of incorporation and bylaws, and the approval of any merger or sale of substantially all of the Company's assets.

23. Defendants Goldman Sachs & Co. LLC, Jefferies LLC, Wells Fargo Securities, LLC, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Truist Securities, Inc., Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., Canaccord Genuity LLC, Needham & Company, LLC, and Academy Securities, Inc. are referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as underwriters of the IPO and shared in the over $36 million in underwriting fees (discounts and commissions) generated by the IPO. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of YSS common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market YSS common stock, and those personnel worked on and approved the content of YSS's Registration Statement and other offering materials;

(b) The Underwriter Defendants demanded and obtained an agreement from YSS that YSS would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that YSS had purchased millions of dollars in directors' and officers' liability insurance;

(c) Representatives of the Underwriter Defendants also assisted YSS and the Individual IPO Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of YSS, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning YSS's operations and financial prospects;

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with YSS's management, top executives, and outside counsel and engaged in drafting sessions in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which YSS stock would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about YSS would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and YSS's management and top executives, such as the Individual IPO Defendants, the Underwriter Defendants knew, or should have known, of YSS's existing problems as detailed herein; and

(e) The Underwriter Defendants solicited and sold in the IPO YSS common stock to plaintiff and other members of the Class (defined below) for their own financial benefit. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

24. YSS, the Individual IPO Defendants, AE Industrial, and the Underwriter Defendants are referred to herein as the "Defendants."

25. Wallinger and Messerle are referred to herein as the "Officer Defendants."

26. YSS and the Officer Defendants are referred to herein as the "1934 Act Defendants."

## SUBSTANTIVE ALLEGATIONS

27. YSS was founded in 2012 by its CEO, defendant Wallinger, purportedly "to create an innovative space technology mission prime, with a goal of meeting the evolving national security threats from space by providing mission-critical spacecraft at scale, faster, and at lower cost."[2] YSS is backed by U.S. private equity firm AE Industrial, which (through affiliates) acquired a majority stake in the Company in 2022.

28. The Company's largest customer is the Space Development Agency ("SDA") which has formally been part of the U.S. Space Force ("USSF") since October 2022. The SDA focuses on rapidly developing and deploying next-generation, space-based military capabilities. The SDA's flagship project is the Proliferated Warfighter Space Architecture ("PWSA"), a new space-based architecture comprised of a constellation of at least 300 to 500 low Earth orbit

---

[2] Within defense contracting parlance, a "prime" is a private company that holds a direct contractual relationship with a government to oversee and execute major defense projects.

("LEO") satellites designed to detect and track missiles and hypersonic weapons that are not easily detected, identified, or tracked by current space-based warning systems. The PWSA is intended to complement other space systems currently providing this capability. The DoD has committed nearly $11 billion to this effort since 2020 and had planned to spend a total of nearly $35 billion through fiscal year 2029.

29. The PWSA is to consist of seven "layers" designed to deliver or enable specific warfighting capabilities: (1) Tracking Layer; (2) Transport Layer; (3) Battle Management Layer; (4) Custody Layer; (5) PWSA Futures; (6) Navigation Layer; and (7) Ground & Launch.[3] As relevant here, the Tracking Layer is used to detect, warn, and track advanced missile threats, including hypersonic glide vehicles. The Transport Layer is to provide a mesh network of low-latency communication satellites that connect to one another and to other space vehicles and ground stations via laser-based optical intersatellite links. Working in conjunction, the Tracking Layer is to identify threats and the Transport Layer is to communicate those threats to the relevant military assets.

30. The SDA aims to rapidly deliver capability and frequently update technology by delivering satellites through a series of two-year tranches, with each tranche essentially representing one generation, or iteration, of the architecture. Prior to the Company's IPO, three tranches of the Transport Layer of the PWSA had been funded – Tranche 0, Tranche 1, and

---

[3] Some layers do not have a dedicated constellation of satellites, instead delivering capabilities with sensors, processors, or other technologies hosted on another layer's satellites. For instance, the Battle Management Layer is to provide a software framework and processing capabilities that are to be hosted on most or all of the PWSA satellites.

Tranche 2 – pursuant to which YSS, Lockheed Martin, and Northrup Grumman were awarded contracts to provide communications satellites and related systems.

31. YSS's status as a prime contractor for the Transport Layer of the PWSA was of singular significance to the Company's well-being. The SDA has historically accounted for substantially all of the Company's revenue and backlog. For example, approximately 96% and 94% of Company revenues were derived from projects contracted by the U.S. Federal Government for the nine months ended September 30, 2025 and 2024, respectively.

32. YSS has historically lost money. For example, YSS posted net losses of $98.9 million for the year ended December 31, 2024, and net losses of $56 million for the nine months ended September 30, 2025. Given these losses, which were projected to continue for several years, YSS was heavily dependent on revenues generated as a contractor for the Transport Layer of the PWSA.

33. On November 17, 2025, YSS filed with the SEC a registration statement for the IPO on Form S-1 which, after amendments, was declared effective on January 28, 2026. On January 30, 2026, the Company filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement. In connection with the IPO, Defendants used the Registration Statement to sell 18.5 million shares of YSS common stock at $34 per share, raising $629 million in gross offering proceeds.

34. The Registration Statement contained material misrepresentations and omissions about YSS's business, the quality of its spacecraft solutions, the Company's performance as a contractor for the PWSA's Transport Layer, the funding of future tranches of the Transport Layer,

and the nature and magnitude of the risks and uncertainties that investors faced at the time of the IPO.

35. For example, the Registration Statement praised the Company's "world-class technical expertise and proven execution," highlighting YSS's "price, speed to deployment, and sophistication of capabilities" such as its "proprietary hardware and software capabilities" and "proven production and delivery capabilities."

36. The Registration Statement similarly described YSS as a "Distinguished Mission Prime" "[w]ith fully integrated suite of products and software" that was the "PARTNER OF CHOICE WITH DIFFERENTIATED PERFORMANCE BEATING THE TRADITIONAL PRIMES ON PRICE, SPEED TO DEPLOYMENT, AND CAPABILITIES."

37. The Registration Statement also highlighted the Company's role in servicing the PWSA, describing YSS as the "number one provider to DoD PWSA by number of spacecraft operating in-orbit, by number of contracts, and by variety of contract types as of September 2025." The Registration Statement emphasized YSS's "performance history across PWSA Tranches 0, 1, and 2" and its "incumbent position leading into Tranches 3 and 4" for the SDA's Transport Layer.

38. In truth, prior to the IPO YSS had repeatedly fallen short in performing under its PWSA contracts with the SDA, including scheduling delays, software deficiencies, and the failure to timely establish minimum viable capabilities. YSS's performance was so woefully inadequate that, by 2025, the Pentagon had decided against funding Tranche 3 of the Transport Layer in its

fiscal year 2026 ("FY26") budget.[4] And, when the DoD's FY26 budget was ultimately appropriated by the Consolidated Appropriations Act, 2026 – mere days after YSS's IPO – Congress acquiesced to the Pentagon's decision and only appropriated to the DoD a token $50 million "to maintain warfighter centric capabilities within the PWSA architecture."

39. During the remainder of the Class Period, the 1934 Act Defendants made additional misstatements that failed to acknowledge the Company's inadequate performance under its PWSA contracts and failed to account for the defunding of Tranche 3 of the Transport Layer. For example, YSS repeatedly provided 2026 revenue guidance indicating that the Company was on track to secure approximately $170 million in new business notwithstanding any changes to the PWSA program.

40. Since the Company's IPO, the price of YSS common stock has fallen from more than $38 per share to less than $6 per share – ***more than 80% below the IPO price***. At the time of the filing of this complaint, the price of YSS stock remains substantially below the $34 IPO price.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

41. The Registration Statement highlighted the purported "price, speed to deployment, and sophistication of capabilities" of YSS's "turnkey"[5] spacecraft solutions, including their "proprietary hardware and software capabilities" and "proven production and delivery

---

[4] The U.S. Federal Government's fiscal year ("FY") runs from October 1 to September 30 of the following calendar year. Each FY is identified by the calendar year in which it ends. Thus, the U.S. Federal Government's FY26 began on October 1, 2025 and ended on September 30, 2026.

[5] A "turnkey" solution or project is complete and ready to operate immediately upon delivery or purchase, requiring no extra building, fixing, or setup by the buyer.

capabilities," as well as the Company's status as the "number one provider" to the DoD's PWSA, stating in relevant part as follows:

> ***York Space Systems is a leading, U.S.-based, space and defense prime providing a comprehensive suite of mission-critical solutions for national security, government and commercial customers. York is one of the only space and defense primes with proprietary hardware and software capabilities designed to address customers' complex mission requirements across the critical elements of the entire space ecosystem throughout the mission lifecycle. York is the number one provider to the U.S. Department of Defense's ("DoD") Proliferated Warfighter Space Architecture ("PWSA") by number of spacecraft operating in-orbit, by number of contracts, and by variety of contract types as of September 2025. York is a partner of choice for our customers, with differentiated performance versus traditional primes based on price, speed to deployment, and sophistication of capabilities***. We produce our satellites at approximately half the cost of our competitors and have been the first to deliver and launch satellites for the PWSA. York is the first and only company to demonstrate Link-162 connectivity from space, highlighting our unique and innovative capabilities.
>
> ***York is purpose built to address evolving national security space challenges and to adapt to the ongoing shift in the U.S. government's mission needs and procurement process. We believe we are positioned to capture an outsized share of growth in our core markets. York provides customers a vertically integrated, full technology stack of solutions including design, production, integration, and operation of spacecraft with turnkey offerings to manage spacecraft and constellations throughout their entire mission lifecycle***. York has significant space heritage, having flown 74 missions, created 17 products with flight heritage, and logged over four million on-orbit hours. York's position as a prime enables us to monetize the entire space vertical from launch to mission operations, from spacecraft to payloads, and from edge computing to data transfer.
>
> York was founded in 2012 by our CEO, Dirk Wallinger, to create an innovative space technology mission prime, with a goal of meeting the evolving national security threats from space by providing mission-critical spacecraft at scale, faster, and at lower cost. We believe that ***York's proven production and delivery capabilities*** place it among a very limited number of companies who have the capability to deliver the required solutions for the Golden Dome based on its current timeline. ***We provide our customers with the ability to quickly and effectively field responsive space-based technologies. Our proprietary hardware, software and mission operations solutions are designed to address the United States' national security priorities: missile defense (crucial to the Golden Dome), counter-space capabilities, and space domain awareness***.

42. In a section describing "York's Key Highlights," the Registration Statement emphasized how the Company's "track record" in building out the PWSA purportedly positioned the Company for future success, stating in relevant part as follows:

> ***York is the number one provider to DoD PWSA by number of spacecraft operating in-orbit, by number of contracts, and by variety of contract types as of September 2025. We continue to differentiate from our competitors by winning on price, speed and capabilities***.
>
> We are the first and only company to demonstrate Link-16 connectivity from Space. This is a significant and critical milestone towards advancing the DoD's national security missile defense strategy. York was also the first to achieve LEO-to-LEO laser link between PWSA vendors and Space-to-Ground laser links with another vendor. We believe these two capabilities are critical for Golden Dome contracts and demonstrate York's strong position to win on that program.
>
> ***Over the duration of the PWSA program, we have achieved an 83% win rate on contracts bid (when measured in terms of satellites awarded versus satellites available for award) and have captured 14% of the PWSA contract value awarded. We believe our track record is a testament to the differentiated value proposition that York offers. It illustrates the alignment between York's business model and the new paradigm of the U.S. government's mission needs and procurement processes. This historical win rate gives us confidence in our ability to capture share of our estimated $140 billion Total Addressable Market ("TAM")***.

43. In a section describing the Company's "Challenges," the Registration Statement acknowledged the Company's sensitivity to changes in government funding but presented the risk as wholly theoretical, stating in relevant part as follows:

> ***Our industry is subject to a range of significant challenges and risks that can materially affect our business, financial condition, and results of operations. Substantially all of our revenue is generated from defense markets, with primary contracts concentrated among various governmental entities. This reliance makes us particularly sensitive to changes in government budgets and spending trends, which can directly impact our performance***. In addition, the increasing technological complexity of our business and the solutions we offer presents ongoing management challenges. We have a history of net losses, and there is no guarantee that we will achieve or maintain profitability in the future. To support our growth, we may pursue acquisitions or investment opportunities to complement

> or expand our existing business. However, such initiatives can be costly, time-consuming, and difficult to successfully complete or integrate with our current operations. Our business is also exposed to broader economic and geopolitical uncertainties, including market disruptions, supply chain challenges, high interest rates, and inflationary pressures. These factors have contributed to an inflationary environment that has adversely affected, and may continue to adversely affect, the price and availability of products and services essential to our operations. Furthermore, the global trade environment is uncertain and rapidly evolving. The imposition of tariffs by the U.S. or retaliatory measures by other countries could escalate into a trade war, with the potential to negatively impact our business depending on the timing, duration, and magnitude of such actions.
>
> ***Any number of these challenges, and others, could have a negative impact on our business, financial conditions, and results of operations***.

44. The Registration Statement further highlighted YSS's "world-class technical expertise and proven execution" as what purportedly set the Company apart from its competitors and enabled it to grow, stating in relevant part as follows:

> ***York has changed the economics of space with a suite of innovative technologies that dramatically lower costs while accelerating time to orbit. At the heart of York's model is our modular satellite spacecraft architecture-engineered for scalability, rapid production, and mission flexibility across commercial, civil, and defense applications. By combining proprietary designs with a streamlined manufacturing process, York delivers high-performance satellites faster and more cost-effectively than traditional and emerging aerospace players***.
>
> ***What truly sets York apart is its world-class technical expertise and proven execution. Backed by an experienced team of aerospace engineers and mission specialists, York manages the full lifecycle – from design and manufacturing to launch integration and on-orbit operations – with precision and reliability. The combination of proprietary innovation, technical mastery, and operational excellence creates differentiation, which we expect to enable York to scale rapidly in the space industry***.

45. The Registration Statement further described the Company as "deeply entrenched" with "key U.S. government customers" due its "performance history across PWSA Tranches 0, 1, and 2," which purportedly placed YSS in the "incumbent position leading into Tranches 3 and 4"

and "position[ed] [YSS] exceptionally well to continue to receive a large share of PWSA awards," stating in relevant part as follow:

> *Deeply entrenched with key U.S. government customers with demonstrated ability to win contracts*
>
> York aligns our spacecraft platform baselines and accreditation artifacts to prevailing U.S. government requirement sets, enabling faster Risk Management Framework progression and quicker Authorizations to Operate, which translate into accelerated fielding and responsive tasking. This rigor, combined with pre-engineered cybersecurity and configuration-controlled software releases, underpins wins across space domain awareness, tactical Intelligence, Surveillance and Reconnaissance ("ISR"), and resilient communications where schedule assurance and operational autonomy are decisive. Our use of common avionics, power, and data handling across spacecraft classes reduces qualification churn and simplifies mission assurance, while pre-certified payload interfaces shorten integration timelines and reduce NRE. Together, these elements increase proposal credibility on schedule, cost, and technical readiness – key determining factors in competitive acquisitions.
>
> ***Our advantages extend beyond cost to include*** capacity production, a mature and resilient supply chain, two classified M-MOCs and critical system ownership, and ***demonstrated on-orbit performance success. York has proven the capability for highly efficient manufacturing by delivering the Tranche 0 ("T0") satellite constellation before competitors in 2022, then delivering Dragoon mission in seven months followed by the Bard mission one month later and finally 21 satellites launched for the Tranche 1 ("T1") constellation before the other prime contractors. This production cadence exhibits a mature and robust supply chain and production delivery rhythm***.
>
> * * *
>
> We have demonstrated repeat wins through multi-vehicle awards, options, and frameworks that value mission assurance, cost transparency, and delivery velocity. ***Our performance history across PWSA Tranches 0, 1, and 2 as well as our successful launches with the SDA and NASA translate to strong references, faster award cycles, and growing share across defense, civil, and commercial segments. For example, our space vehicles have participated in multiple military exercises***.
>
> - ***<u>Space Defense Agency</u>: We were a prime awardee on SDA contracts across Tranches 0, 1 and 2 with an <u>incumbent</u> position leading into Tranches 3 and 4. We have provided the most satellites to PWSA at***

> ***roughly half the cost of competitors, positioning us exceptionally well to continue to receive a large share of PWSA awards***.

46. Similarly, in a section about the Company's "Growth Strategy," the Registration Statement highlighted YSS's purported "proven track record" under the PWSA and its proprietary technology as sources of future revenue growth, stating in relevant part:

> *Continue to Exercise Demonstrated Ability to Win*
>
> Our growth strategy is anchored in strengthening and expanding our ability to win future contracts across defense space programs. ***We have a proven track record of cost-effective, on-time delivery under the PWSA, a vertically integrated production model that enables security and scale, and proprietary technology that differentiates us from competitors***. By continually investing in modular designs, software-enabled solutions, and production capacity, we reinforce the attributes the DoD values most: speed, resilience, affordability, and mission assurance. ***These competitive advantages create a clear path for us to continue to win contracts as demand for proliferated, low-cost constellations and integrated software platforms accelerate***.

47. The statements in ¶¶41-46 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) that YSS had failed to provide satisfactory performance under its contracts with the SDA, including as a result of technical defects in Company technologies, software deficiencies, schedule delays, and the failure to timely establish minimum viable capabilities;

(b) that the Pentagon had canceled funding for Tranche 3 of the Transport Layer of the PWSA in its proposed FY26 budget;

(c) that the Pentagon's funding decision was due at least in material part to YSS's inadequate performance;

(d) that funding for Tranche 3 of the Transport Layer had not been appropriated by Congress for FY26 and that Congress was poised to deny the material provision of such funding; and

(e) that, as a result of (a)-(d) above, statements about YSS's technological capabilities, track record of performance, business operations, and prospects were materially misleading.

48. Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

49. Under Item 303, the Registration Statement was required to disclose YSS's inadequate performance under its contracts with the SDA, the funding status for Tranche 3 of the Transport Layer, and the attendant financial impact and risks of these adverse facts, as such facts were known to Defendants and likely to and did have an adverse impact on the Company's sales, revenues, and income from continuing operations. Similarly, under Item 105, these adverse facts should have been disclosed because they constituted some of the most significant risks that made an investment in YSS stock speculative or risky.

50. Defendants failed to make the required disclosures, instead misleadingly describing future contingent risks that "***may***" or may not occur while failing to disclose adverse events that

had already materialized. For example, the Registration Statement stated that YSS "derive[s] a substantial amount of [its] revenues and backlog from [its] largest customer, the Space Development Agency" and that a "material change in the SDA's mandate or spending could reduce future revenues we receive from the SDA, and ***could*** materially reduce our revenues and backlog" but failed to disclose that the Pentagon had ***already*** decided again funding of the Tranche 3 of the Transport Layer in its FY26 budget proposal.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE REMAINDER OF THE CLASS PERIOD**

51. On February 3, 2026 – less than a week after the Company's IPO – President Donald Trump signed the Consolidated Appropriations Act, 2026 into law. Despite appropriating $26.135 billion for USSF, the law only appropriated $50 million to the DoD "to maintain warfighter centric capabilities within the PWSA architecture" with no dedicated allocation to Tranche 3 of the PWSA's Transport Layer.

52. In response to this news, the price of YSS common stock fell from a closing price of $26.52 per share on February 3, 2026 to $23.13 per share on February 5, 2026, a decline of $3.39 per share (13%) over two trading days on abnormally high trading volume. However, the price of YSS stock remained artificially inflated as the 1934 Act Defendants failed to disclose the full truth regarding the Company's business, operations, and financial results.

53. On March 19, 2026, YSS issued a release announcing its fourth quarter 2025 ("4Q25") financial results – its first results as a public company. The release highlighted the Company's ostensible technical prowess, stating in relevant part as follows:

> "2025 was the year York defined what a modern mission prime looks like," said CEO Dirk Wallinger. "We emerged as a leading provider to the Department of Defense's Proliferated Warfighter Space Architecture, measured by spacecraft

> on orbit, number of contracts, and mission types. We delivered the first Tranche 1 Transport Layer satellites in-orbit, accelerated and executed the Dragoon mission in response to an identified agency need, and demonstrated in-plane and cross-vendor optical communications. We remain the only provider to demonstrate Link 16 from space and validated NASA's shift to commercially procured communications through the BARD mission. ***We didn't just win contracts, we delivered real capability on accelerated timelines, at scale, and at approximately half the cost of our competitors***."

54. The release additionally represented that YSS had a $543 million backlog and provided the following revenue guidance for calendar year 2026 ("CY26"):

> York Space Systems expects revenue for the full year 2026 to be in the range of $545 million to $595 million. Over 70% of this, at the midpoint, is expected to come from our existing backlog, giving us high confidence in achieving our goals, and the ability to focus on building our pipeline for beyond this year.

55. On the earnings call that day, an analyst questioned whether "there's been a material change in what you view the PWSA kind of architecture is" and whether it was "materially changing or [was] just morphing into the various classified versions of the Golden Dome."[6] Defendant Wallinger downplayed investor concerns about the future of the PWSA's Transport Layer, claiming that what was happening was essentially an immaterial change in the name of the program under which contracts would be awarded but "[t]here's nothing going away," stating in relevant part as follows:[7]

> I think it's along the lines of what you said in the latter part there. So, look, if it's called PWSA, if it's called Space Data Network, if it's called pLEO, whatever

---

[6] The Golden Dome is a proposed missile defense shield designed to detect, track, and defeat missile threats before they reach U.S. territory. President Donald Trump signed an executive order in January 2025 directing plans for the system, initially called the "Iron Dome for America" before being renamed the Golden Dome. The Golden Dome and the PWSA are distinct initiatives.

[7] The Space Data Network ("SDN") is the USSF's broader, unified multi-orbit communications architecture; and the Military Network (or "MILNET") is the former name for the core LEO "backbone" of that network.

> the name is, the government is definitively moving towards it. And they're delivering contracts pretty quickly now out to performers who are going to execute on this. They need this executed really quickly.
>
> ***So, I don't think it's about, hey, does PWSA, is that going away? Is MILNET going away? There's nothing going away***. Communications is not only absolutely critical for Golden Dome and national defense in general, it's the most important thing; nothing else happens without communication.
>
> So, I think it's more of there's definitely a realization that this is going to be the architecture of the future for the United States. And if it is going to be the architecture for the United States, then it needs to be more coordinated. That's a general theme that we're hearing across anything, whether that's space, whether that's sea, land, air, it has to be more coordinated.
>
> So, I think a lot of the "shifts", I guess, that you're seeing in PWSA transport or MILNET or what have you, Isn't really about, do we need this? It is about, we do need this. How are we going to get them to talk to one another? And maybe we should look at that in more detail and definitize that more before we continue on kind of separate disparate paths, which is kind of what got us into the challenges the United States faces today is, we have lots of amazing capabilities, but they're disparate, they don't talk to one another.
>
> ***So, I think it's really more about that is whatever the name is, it doesn't matter, it's needed***. I think it's just more about, let's make sure that they're going to talk to one another because we've shot ourselves in the foot, like, a couple times over this, so let's not do that anymore. I think it's really more about that. Like, that's the mentality.

56. When another analyst pressed for a "quick update on how you're thinking about transport Tranche 3 and just the path forward for that mission," defendant Wallinger contended that the Transport Layer was likely to become part of the SDN but that YSS was "phenomenal[ly] position[ed] to win significant parts of that" work specifically because of its performance under Tranche 0 and Tranche 1 of the PWSA's Transport Layer, stating in pertinent part as follows:

> Yeah. As I kind of talked about a little bit earlier, there's no doubt that communications is going to be a major part of Golden Dome and national defense in general. I believe that it's going to be restructured under something called the space data network, where they're working through that architecture and what that will look like now. ***My best guess, and it's a guess, is that I think transport will***

> ***probably be part of that space data network, and it will interlink with the other systems***.
>
> So, it kind of goes to what I was saying before of they're realizing that these systems cannot be disparate and unique, and they need to be part of a larger architecture that works together. ***And my feeling is that I think transport will definitively be a part of that. I think that they're working out the details of that architecture now and how that will work***.
>
> ***Obviously, I think that we're in a really phenomenal position to win significant parts of that, given that we've already performed so well on T0, T1. We're already under contract for T2. So, I think our delivered capabilities, flight heritage, and the fact that we were the first time to launch every single time kind of speak to us being able to deliver that mission successfully. So, I think it's going to be part of space data network, and I think that they're working that architecture now and we feel like we're in a strong position to win that work***.

57. The statements in ¶¶51-56 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time the statements were made:

(a) that YSS had failed to provide the government with satisfactory performance under its contracts with the SDA, including as a result of technical defects in Company technologies, software deficiencies, schedule delays, and the failure to timely establish minimum viable capabilities;

(b) that the Pentagon's decision to cancel funding for Tranche 3 of the Transport Layer of the PWSA was due at least in material part to YSS's inadequate performance;

(c) that, as a result of (a)-(b) above, the amount and likelihood that YSS would be awarded additional contracts or federal funding commitments in connection with the PWSA's Transport Layer, the SDN, or the Golden Dome generally had been materially impaired;

(d) that, as a result of (a)-(c) above, YSS was not on track to achieve its revenue guidance and such guidance lacked a reasonable basis in objective fact; and

(e) that, as a result of (a)-(d) above, statements about YSS's technological capabilities, track record of performance, business operations, and prospects were materially misleading.

58. On April 21, 2026, a USSF official confirmed during a briefing with reporters about the service's fiscal year 2027 ("FY27") budget that the USSF did not intend to fund future iterations of the PWSA's Transport Layer, opting instead to build out a new constellation dubbed the "backbone" of the service's SDN. The official stated: "The Transport Layer for Tranche 3 is not funded. Those requirements are going to be rolled into the requirements being filled by the SDN backbone."

59. On May 11, 2026, Wolfpack Research published a report about YSS titled "YSS: Lost In Space – The Pentagon Just Killed 96% of York's Revenues" (the "Wolfpack Report"). The Wolfpack Report summarized its findings regarding YSS, the Company's performance as a contractor for the PWSA, and the impact of the Pentagon's funding decisions as follows:

- We are short York Space Systems Inc. ("York") as 96% of 2025 revenue came from selling satellites to one customer: the Pentagon's Space Development Agency (SDA), and that customer is being eliminated. York's IPO was predicated on the idea that they would continue to experience explosive growth as the "*incumbent*" provider for the SDA's Transport Layer Program. In late April, the Pentagon announced it had wiped out future funding for SDA's Tranche 3 Transport Layer and is dissolving the SDA itself for good measure, effectively gutting the program upon which York based its growth thesis in its January IPO. This is not a freeze, nor a hiccup. The program York relied on is being replaced by a program built around SpaceX as the sole-source provider. We spoke with multiple former employees who were highly critical of York and heard claims that York deceived the SDA with false advertising to win its contracts, cut corners, and delivered satellites whose mission-critical-software was not completed. Given this context, we believe the Pentagon's decision to eliminate Tranche 3 of the Transport Layer ("Tranche 3") was rooted in severe disappointment in York.

(Emphasis in original.)

60. The Wolfpack Report provided a litany of YSS's failures in the initial tranches of the PWSA's Transport Layer. Examples of such failures, in some instances bolstered by statements reportedly made by former YSS employees, included, *inter alia*:

- "Two former software engineers told us ***the company sent satellites into space without even knowing if the software was fit to accomplish its basic mission***, so it did not fall behind on launch schedules. As a former employee told us, of York's satellites '*They all have problems in flight*.' The problems with the software apparently became glaring post-launch and we were told that the SDA has been '*pretty unhappy*.' These problems have since been confirmed, as it was reported in March that the satellites launched as part of Tranche 1 are '*three months behind*' and there has been a '*strategic pause*' on further launches until May/June 2026."

- "Another former employee told us that York would cut corners and use unqualified people, like office administrators and accountants to build parts and perform tests. The result? A former employee told us that York's satellites were '*figuratively held together by Band-Aids*' and were '*low quality*.'"

- "One former employee gave lots of color on this point: '*One of the weirdest things I realized was that they have this mentality of no matter who you are, if there's an urgency, you are doing something to build that vehicle. And so, for instance, they hired high school students to help build harnesses. . . . And so I – I mean, we even had people in accounting building things, and it's just like, that is not appropriate, and they are not trained appropriately to do that.*'"

- "A former employee told us that all the satellites have had problems in flight due to incomplete software: '*No, I mean, they* ***all have problems in flight****, and a lot of it is relying on, especially software, software is never really fully developed before they're launched. And so there's a lot of debugging that happens while they're in orbit,* ***which means that the customer does not get the science that they asked for*** *from the payload because [York is] still working through the kinks*.'"

- "A former software engineer corroborated this; explaining that **York would wait to fully develop the spacecraft's software until orbit** because the company was so behind schedule[:] '*We were way behind schedule in terms of a lot of the mission functionality. So, then we planned over on-air updates while it was on orbit as we fleshed out, you know, some of those requirements and details of how the mission was really going to work.*'"

- "A former manufacturing employee told us that employees became more aggressive when building Tranche 1 as deadlines loomed, stating: '*If they could find the smallest level of test that would give them an indication it was okay, they would run with it . . . it's just cutting that little extra corner to save 20 or 30 minutes when it could result in another 2 hours of rework because they didn't fully test something.*'"

- "A former employee informed us that York's obsession with spending as little money as possible made it so every time they ran into an issue, they would slap on some kind of Band-Aid solution and push on without addressing the underlying design or engineering problem. In the opinion of this former employee, this led to a very low-quality satellite[:] '*I was told to Band-Aid everything that I can. And I pushed back and I said, well, Band-Aids, that's like the worst way to do this. You know, let's like get to the root of the problem and like set up a way to like make sure this doesn't happen again or make sure we're doing the right thing. And you know, work with the people involved. And it's no, you need to go in there and like fix it yourself, put a Band-Aid on it, we'll deal with it later, with everything. And so* ***these spacecrafts are . . . figuratively held together by Band-Aids. And so quality is low****, morale is low.*'"

(Emphasis in original.)

61. On May 14, 2026, after the market closed, the Company issued a release announcing its first quarter 2026 ("1Q26") results. The release reaffirmed the Company's revenue guidance for CY26: "We are reaffirming our revenue guidance range of $545 million to $595 million for the full year 2026, as provided on our March 19, 2026 press release."

62. On the earnings call that day, defendant Messerle dismissed any concerns about the Pentagon's decision not to fund Tranche 3 of the Transport Layer in its proposed FY27 budget by reaffirming the Company's CY26 revenue guidance, stating as follows: "Looking ahead, we expect revenue for the year to be in the range of $545 million to $595 million, up 48% year-over-year at the midpoint. This is unchanged from our previous guidance."

63. Defendant Messerle added, however, that revenues for the second quarter 2026 ("2Q26") would be lower than originally expected due to the supply chain issues, but that the 2Q26

shortfall would be offset in the second half of 2026 at least in part by "unprecedented bid activity in other areas," stating as follows:

> ***The recent changes at SDA have not reduced our nation's need for communications in contested environments. We continue to compete for that business based on the strength we've shown in the past. With regards to Q2, in particular, I would note that we are experiencing delays in supply of certain components that will push a portion of revenue associated with those costs into the second half of the year. We believe these near-term headwinds are balanced by the unprecedented bid activity in other areas, netting out to an unchanged forecast for the full year***.

64. In response to this news, the price of YSS common declined from a closing price of $28.94 per share on May 14, 2026 to $24.02 per share on May 15, 2026, a decrease of $4.92 per share (17%) on abnormally high trading volume. However, the price of YSS stock remained artificially inflated as the 1934 Act Defendants failed to disclose the full truth regarding the Company's business, operations, and financial results.

65. On May 26, 2026, the USSF announced that it had awarded SpaceX a fixed-price $2.29 billion contract to build a secure, high-speed satellite communications network to connect military sensors and weapons platforms worldwide.

66. On August 5, 2026, YSS announced that, effective August 14, 2026, defendant Messerle was stepping down as CFO and current CAO Brian Frantz would serve as interim CFO.

67. In response to this news, the price of YSS common stock decreased from a closing price of $13.15 per share on August 5, 2026 to $10.89 per share on August 6, 2026, a decrease of $2.26 per share (17%) on abnormally high trading volume. However, the price of YSS stock remained artificially inflated as the 1934 Act Defendants failed to disclose the full truth regarding the Company's business, operations, and financial results.

68. Finally, on August 13, 2026, YSS issued a release announcing its 2Q26 results, revealing that the Company's backlog had fallen 8% sequentially to just $592 million by quarter's end. The release also slashed the Company's CY26 revenue guidance by $180 million at the midpoint of its prior range, a reduction which exceeded the $171 million that YSS had originally provided as guidance for all new contracts in CY26 and which therefore was tantamount to an admission that YSS expected limited new business in CY26. The release attempted to attribute the shortfall to governmental delays notwithstanding the fact that one of the Company's primary competitors – SpaceX – had recently been awarded a multi-billion dollar contract to build communications satellites to work in conjunction with those in the Transport Layer, stating in pertinent part as follows:

> Brian Frantz, interim CFO and CAO of York said, "Our newer programs are driving strong profitability improvements, and we continue to successfully win a large rate of the contracts available to us as we wait on the government to make progress against the larger programs in the budget. As a result, we are bringing down our full year 2026 revenue guidance. That said, the contracts we've secured this year under the new acquisition approach are the onboarding positions that we expect to convert to significantly larger operational programs, and we expect them to be meaningful drivers of growth in 2027 and beyond."
>
> * * *
>
> York Space Systems expects revenue for the full year 2026 to be in the range of $375 million to $405 million. The majority of the decrease in guidance is due to the removal of the new business revenue in 2026 given the shift in government acquisition methodologies.

69. On the earnings call that day, defendant Wallinger attempted to explain away YSS's inability to generate substantial new business in CY26 by blaming changes in the "broader US government acquisition landscape" even though the proposed defunding of Tranche 3 of the Transport Layer predated the Company's IPO, stating in pertinent part as follows:

> Before I turn it over to Brian [Frantz] to review the financials in depth, I want to speak briefly to what we're seeing across the broader US government acquisition landscape and what it means for York's growth trajectory. Through 2026 and increasingly in Q2, we've observed a meaningful shift in how the US government is acquiring spacecraft systems, moving away from a rapid succession of larger RFPs to an IDIQ approach that is slow to start, but often faster to accelerate task orders later. This approach has a longer cycle to award the IDIQs initially, but once IDIQs are awarded, task orders can be awarded in more rapid succession without the need for follow-on competitive award cycles.
>
> They generally pursue smaller on-ramp task order contracts to start, but can lead to multi-billion dollar opportunities later for true operational systems. Highly selective IDIQs are more desirable as the budget size and smaller vendor pool represent significant revenue potential for awardees on discriminating IDIQs.
>
> York has been awarded six contracts under this new approach in 2026 alone, and we view them as significant drivers of growth into 2027 as the follow-on programs advance. York's contract wins range across very large swaths of capabilities that align well with the current budget allocations we are seeing. This shift is changing our expectations of award timing, and as a result, we are revising our full year 2026 revenue guidance. Brian will walk through the specifics in a moment. With our backlog potential on awarded contracts totaling $1.85 billion, and an identified pipeline exceeding $11.5 billion, the opportunity in front of us is substantial.

70. Interim CFO Brian Frantz explained YSS's guidance cut in part by acknowledging the removal of new business from the Company's forecast, stating in relevant part as follows:

> As Dirk mentioned earlier, we are bringing down our full year 2026 revenue guidance to a range of $375 million to $405 million. This new midpoint of $390 million is $180 million below our prior midpoint of $570 million. As we said on our previous call, about 30% of the prior midpoint of $570 million was new business.
>
> Given the contract environment that Dirk referenced, we had removed the new business from our guidance for the rest of the year. The remainder relates to supply chain issues, where revenue is moving to the right into 2027, which is partially offset by revenue from our new acquisitions. We believe the rightward shift of 2026 revenue plus the eight contracts we've already won so far this year position us to take significant strides in 2027, as the government looks to accelerate capabilities with proven providers.
>
> Our reduction in revenue guidance will also negatively impact adjusted EBITDA in the second half. Further, the acquisition of Solestial, which will bolster

> our supply chain certainty of solar cells and the acquisition of ALL.SPACE to expand our total addressable market will further impact adjusted EBITDA in the second half.

71. In response to this news, the price of YSS common stock decreased from a closing price of $11.51 per share on August 13, 2026 to $10.93 per share on August 14, 2026, a decrease of $0.58 per share (5%) on abnormally high trading volume. In the days that followed, the price of YSS stock continued to decrease, falling to lows of less than $8 per share by mid-September 2026 – three quarters below the $34 IPO price. The price of YSS stock has subsequently continued to decline.

72. As a result of Defendants' materially false and misleading statements, detailed herein, Plaintiff and the Class (defined below) have suffered financial losses and economic damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action as a class action on behalf of: (1) all purchasers of YSS common stock in or traceable to the Company's IPO; and/or (2) all purchasers of YSS common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

74. The members of the Class are so numerous that joinder of all members is impracticable. YSS common stock is actively traded on the NYSE and millions of shares were sold in the IPO. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by YSS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

75. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

76. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the 1933 Act was violated by Defendants as alleged herein;

(b) whether the statements made to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in YSS;

(c) whether the 1934 Act was violated by the 1934 Act Defendants and AE Industrial as alleged herein;

(d) whether the statements made to the investing public by the 1934 Act Defendants during the Class Period misrepresented material facts about the business, operations, and risks of investing in YSS;

(e) whether the 1934 Act Defendants acted with the requisite scienter; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**NO SAFE HARBOR**

79. The Private Securities Litigation Reform Act of 1995's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

80. None of the statements complained of herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made. Moreover, the statutory safe harbor does not apply to statements made in connection with an initial public offering.

81. To the extent that any of the materially false and/or misleading statements alleged herein, or any portion thereof, can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

82. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the 1934 Act Defendants are liable for any such statement because at the

time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of YSS who actually knew that such statement was false when made.

**LOSS CAUSATION**

83. The market for YSS common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, YSS common stock traded at artificially inflated prices as a direct result of the 1934 Act Defendants' false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiff and other members of the Class purchased YSS common stock relying upon the integrity of the market price for YSS shares and market information relating to YSS, and they have been damaged thereby. When the relevant truth became known and/or the materialization of the risk that had been concealed by the 1934 Act Defendants occurred, the price of YSS common stock declined immediately and precipitously because the artificial inflation was removed from the market price of the common stock, causing substantial damage to plaintiff and the Class, as detailed herein.

**SCIENTER ALLEGATIONS**

84. The 1934 Act Defendants acted with scienter in that the 1934 Act Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of YSS, or in their own name, during the Class Period were materially false and misleading. The 1934 Act Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The 1934 Act Defendants, by virtue of their

receipt of information reflecting the true facts regarding YSS and its business, their control over and/or receipt and/or modification of YSS's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

85. The 1934 Act Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of YSS, including the Officer Defendants.

86. The Officer Defendants, because of their positions with YSS, controlled the contents of YSS's public statements during the Class Period and were intimately involved in YSS's business. The Officer Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

87. In addition, the 1934 Act Defendants were highly motivated to conceal the true facts detailed herein in order to complete the IPO, which helped YSS raise $629 million in gross offering proceeds despite the Company's unprofitability and expectations of continued unprofitability for the next several years.

88. Similarly, the 1934 Act Defendants were motivated to conceal the true facts to allow YSS to acquire three companies using Company stock whose value was inflated by the 1934

Act Defendants' fraud, embarking on an acquisition spree in an attempt to fill the revenue shortfall expected due to the government's defunding of Tranche 3 of the Transport Layer:

(a) First, on March 6, 2026, YSS entered into a merger agreement to acquire Orbion Space Technology, Inc. ("Orbion"), a manufacturer of "flight-proven electronic propulsion systems." YSS paid $11.2 million[8] in cash and approximately 2.8 million shares of Company stock, which was valued in the merger agreement at $34 per share (the same as the IPO price), yielding total consideration paid of approximately $107 million[9];

(b) Second, on April 29, 2026, YSS entered into a merger agreement to acquire ALL.SPACE, a "leading provider of advanced satellite communications terminals and multi-network connectivity solutions." On July 8, 2026, YSS closed on this acquisition, paying approximately $155 million in cash and 5.9 million shares of YSS common stock valued at $34 per share for an aggregate purchase price of $355 million. In connection with the Company's acquisition of ALL.SPACE, affiliates of AE Industrial received 2.3 million shares of Company common stock as part of the merger consideration paid to former equity holders of ALL.SPACE; and

(c) Third, on May 15, 2026, YSS entered into a merger to acquire Solestial, Inc. ("Solestial"), "an Arizona-based provider of space solar technology with self-healing silicon technology proven on orbit." On June 4, 2026, YSS closed on this acquisition, paying $15.5

---

8 Notably, the 2025 Form 10-K states that YSS paid $8.9 million in cash consideration for Orbion, whereas the 1Q26 Form 10-Q says that YSS paid $11.2 million in cash consideration.

9 These amounts do not include YSS's $5 million investment in the preferred equity of Orbion in December 2025.

million in cash and 1.7 million shares of Company stock, which was valued in merger agreement at a negotiated price of $34 per share. This represented total consideration paid of approximately $73 million.[10] Affiliates of AE Industrial received over 430,000 share of common stock as part of merger consideration paid to former equity holders of Solestial.

89. Tellingly, all three of these acquisitions were entered into prior to the USSF's contract award to SpaceX on May 26, 2026 and the Company's disastrous CY26 revenue guidance reduction.

90. Moreover, given the Officer Defendants' positions at the Company and their roles in the fraud, knowledge of the true facts can be imputed to the Officer Defendants because the fraud relates to YSS's core operations. As detailed herein, substantially all of the Company's revenues and backlog came from contracts awarded by the SDA, particularly for YSS's work on the PWSA's Transport Layer. Under these circumstances, it would be improbable to suggest that the Officer Defendants were unaware of the Company's performance failures under its contracts with its important client, the Pentagon's defunding of Tranche 3 of the Transport Layer, and the federal government's negative appropriation decisions.

91. Lastly, on August 5, 2026, YSS announced that defendant Messerle was stepping down as CFO effective August 14, 2026 (*i.e.*, the day after the Company reported its 2Q26 results and cut its CY26 revenue guidance). The unplanned departure of a senior officer who had direct knowledge of and access to the facts concealed from investors as alleged herein further bolsters an already compelling inference that the 1934 Act Defendants acted with scienter.

---

[10] These amounts do not include the minority equity investments of $3 million and $1 million that YSS made in Solestial on February 9, 2026 and May 7, 2026, respectively.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

92. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the 1934 Act Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

93. Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for YSS common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) YSS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) YSS regularly communicated with public investors via established market communication mechanisms, including regular dissemination of releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with financial press and other similar reporting services; and

(c) YSS was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

94. As a result of the foregoing, the market for YSS common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of YSS common stock. Under these circumstances, all

those who transacted in YSS common stock during the Class Period suffered similar injury through their transactions in YSS common stock at artificially inflated prices and a presumption of reliance applies.

95. Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased YSS common stock between the time the 1934 Act Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for YSS common stock, and are entitled to a presumption of reliance on 1934 Act Defendants' materially false and misleading statements and omissions during the Class Period.

**COUNT I**

**For Violation of §11 of the 1933 Act Against YSS, the Individual IPO Defendants, and the Underwriter Defendants**

96. Plaintiff incorporates ¶¶1-78 by reference.

97. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against YSS, the Individual IPO Defendants, and the Underwriter Defendants.

98. This Count does not sound in fraud. For this Count, Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

99. The Registration Statement was negligently prepared and, as a result, was inaccurate and misleading, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and omitted to state material facts required to be stated herein.

100. The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors of the Company named with their consent in the Registration Statement or as the underwriters of the IPO.

101. YSS is the registrant for the IPO. As the issuer of the shares, YSS is strictly liable to plaintiff and the Class for the misstatements and omissions.

102. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

103. By reason of the conduct alleged herein, each defendant violated §11 of the 1933 Act.

104. Plaintiff purchased YSS stock registered pursuant to the Registration Statement and traceable to the IPO.

105. Plaintiff and the Class have sustained damages. The value of YSS stock has declined substantially subsequent to and due to defendants' violations.

106. At the time of their purchases of YSS common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

**COUNT II**

**For Violation of §15 of the 1933 Act
Against AE Industrial, YSS, and the Individual IPO Defendants**

107. Plaintiff incorporates ¶¶1-78, 96-106 by reference.

108. This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against AE Industrial, YSS, and the Individual IPO Defendants.

109. This Count does not sound in fraud. For this Count, Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §15 claim.

110. AE Industrial controlled YSS at the time of the IPO through its ownership of YSS shares, its appointment of YSS executives and members of the Board, its control over the Company through various transactions and agreements with YSS, and its historical relationship with the Company and its management.

111. The Individual IPO Defendants controlled YSS at the time of the IPO by virtue of their status as directors, and/or senior officers as detailed herein. The Individual IPO Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of YSS and/or through their positions with YSS's private equity owner, AE Industrial.

112. Defendants YSS and AE Industrial controlled the Individual IPO Defendants and all of their employees.

113. The defendants named herein each also participated in the violations of §11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the

Registration Statement, selling YSS common stock in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

114. By reason of such conduct, the defendants named herein are liable as control persons pursuant to §15 of the 1933 Act for the violations of the 1933 Act by persons under their control in connection with the IPO.

## COUNT III

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against the 1934 Act Defendants

115. Plaintiff incorporates ¶¶1-95 by reference.

116. This Count is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of the Class, against the 1934 Act Defendants.

117. During the Class Period, the 1934 Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118. The 1934 Act Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of YSS common stock during the Class Period.

119. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for YSS common stock. Plaintiff and the Class would not have purchased YSS common stock at the prices they paid, or at all, if they had been aware that market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT IV

### For Violation of §20(a) of the 1934 Act Against the 1934 Act Defendants and AE Industrial

120. Plaintiff incorporates ¶¶1-95, 115-119 by reference.

121. This Count is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a), on behalf of the Class, against the 1934 Act Defendants and AE Industrial.

122. The Officer Defendants controlled YSS during the Class Period by virtue of their status as directors and/or senior officers as detailed herein. The Officer Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of YSS and/or through their positions with YSS's private equity owner, AE Industrial.

123. AE Industrial controlled YSS during the Class Period through its ownership of YSS shares, its appointment of YSS executives and members of the Board, its control over the Company through various transactions and agreements with YSS, and its historical relationship with the Company and its management.

124. Defendants YSS and AE Industrial controlled the Officer Defendants and all of YSS's employees.

125. By reason of such conduct, the 1934 Act Defendants and AE Industrial are liable as control persons pursuant to §20(a) of the 1934 Act for the violations of the 1934 Act by persons under their control during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: October 19, 2026

s/ Jeffrey A. Berens
JEFFREY A. BERENS

JOHNSON FISTEL, PLLP
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: 303/861-1764
jeffb@johnsonfistel.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
rgonnello@rgrdlaw.com

Attorneys for Plaintiff